UNITED STATES

v.

**Staff Sergeant Stephen C. POND,
FR190–50–6923, United States
Air Force.**

**ACM 29212 (recon).**

U.S. Air Force Court of Military Review.

Sentence Adjudged 18 July 1991.

Decided 25 Feb. 1993.

Appellate Counsel for the Appellant: Colonel Jeffrey R. Owens, Lieutenant Colonel Terry J. Woodhouse, Major Ronald G. Morgan, and Captain Robert I. Smith.

Appellate Counsel for the United States: Lieutenant Colonel Brenda J. Hollis, Lieutenant Colonel Jeffery T. Infelise, Lieutenant Colonel Joseph J. Urban, Major Paul H. Blackwell, Jr., Major Robert Williams, and Captain Thomas E. Wand.

Before LEONARD, JAMES and JOHNSON, Appellate Military Judges.

## OPINION OF THE COURT

## UPON RECONSIDERATION

LEONARD, Senior Judge:

This case considers whether urinalysis results from a nonconsensual taking of a urine sample by a civilian police officer, without a warrant or exigent circumstances, may be used as evidence in a court-martial to prove use of an illegal drug.[1] We find the urinalysis results inadmissible because the taking of the urine sample did not comply with the state implied consent statute and violated the Fourth Amendment.

### I. Facts.

According to his testimony, Pond engaged a waitress in conversation while passing his time at a bar in San Bernardino County, California. She apparently felt sorry for him and gave him a "dime" bag of methamphetamine.[2] Pond testified he put some methamphetamine in his mouth and the rest in his drink. He then placed the small plastic bag containing residue of the methamphetamine in his wallet to throw away as he drove home. A short time later, Pond left the bar on his motorcycle.

A deputy sheriff of San Bernardino County saw Pond leave the bar and make a left turn without giving a signal. The deputy stopped Pond and asked for his license, insurance, and registration. Pond could not produce a driver's license or proof of insurance. The deputy observed that Pond smelled of alcoholic beverage, had dilated pupils,[3] and appeared agitated. The depu-

---

1. We originally decided appellant's case on 19 November 1992. The government requested we reconsider. We granted the government request and specified issues we wished the parties to brief before our reconsideration. Both parties have submitted their briefs, and we are now issuing our opinion upon reconsideration.

2. In drug vernacular, a "dime" or "dime bag" refers to the quantity normally purchased for $10.

3. During the roadside questioning, the deputy compared the dilated portion of Pond's eyes with a card showing different diameters of circles and found that Pond's eyes were dilated to a size of 8 millimeters.

ty's experience and training led him to believe Pond was under the influence of some drug. He began asking Pond about how much he had to drink and whether he had taken any drugs that would dilate his pupils. Pond admitted drinking three to five beers, but he initially denied using any drugs. After the deputy asked Pond three to five times about possible causes for his dilated pupils, Pond admitted he used methamphetamine at the bar. The deputy questioned Pond at the roadside about half the distance between the patrol car and Pond's motorcycle. The deputy asked the questions in a normal conversational tone, and Pond was not under arrest at the time they were asked.

After Pond's admission, the deputy had Pond perform three field sobriety tests. Pond passed all three tests but did them in an unusually rapid manner. Pond's performance on the tests further confirmed the deputy's suspicion that Pond was under the influence of a drug and not alcohol. After completing the tests, the deputy examined Pond's tongue and found it white-coated, another sign that Pond was under the influence of a stimulant. At that point, the deputy decided to arrest Pond and asked him to empty his pockets and place the contents on the hood of the patrol car. Looking through the items in Pond's pockets, the deputy found the small plastic bag with residue of methamphetamine in Pond's wallet. The deputy then arrested Pond, handcuffed him, and read him *Miranda* rights.

After the arrest, the deputy took Pond to the central police station to book him and get a urine sample from him. According to the deputy, he took the urine sample to comply with California's implied consent law requiring a breath, blood, or urine sample from a person arrested for suspicion of driving under the influence of alcohol or drugs. At the time of Pond's arrest, only breath or urine tests were available at the police station where the deputy took Pond. The deputy knew a breath test would not detect the presence of methamphetamine so he directed Pond to provide a urine sample. The deputy did not tell Pond the implied consent law required he give the sample. He also did not inform Pond about the consequences of refusing to provide the sample or offer Pond an option to refuse or to take another type of test.[4] The deputy told Pond to provide a urine sample and personally watched him urinate into the specimen bottle. After Pond gave the urine sample, the deputy took him to the jail where he was processed and placed in a cell. Pond's urine sample tested positive for use of methamphetamine.

At trial, Pond moved to suppress his admission of methamphetamine use to the deputy, the plastic bag containing methamphetamine residue, and the positive urinalysis result. The government presented the testimony of the deputy and a reserve deputy who was with him at the time of Pond's arrest. Pond testified for the defense on the motion. In addition to the testimony, the military judge took judicial notice of California Vehicle Code § 23157. The military judge denied all three motions to suppress, and Pond appeals all three rulings.

After the military judge denied his motions to suppress evidence acquired by the civilian police officer and another motion to find the offenses multiplicious, appellant entered a conditional guilty plea, *see* R.C.M. 910(a)(2), to wrongful use of methamphetamine, wrongful possession of methamphetamine, and operation of a motorcycle while impaired by methamphetamine.

## II. Suppression of Pond's Admission.

■ We agree with the military judge's decision denying Pond's motion to suppress his admission of methamphetamine use. Mil.R.Evid. 305(h)(1) provides:

When a person subject to the code is interrogated by an official or agent of ... a State ... or any political subdivision of such a State ... the person's entitlement to rights warnings ... shall

---

4. California's implied consent statute in effect at the time of appellant's arrest required any testing of blood, breath, or urine to be incident to lawful arrest. It also required the arresting officer advise the arrested person of the consequences of failing to submit to the testing and the choice of tests available. California Vehicle Code § 23157, Stats.1986.

be determined by the principles of law generally recognized in the trial of criminal cases in the United States district courts involving similar interrogations.

The military judge found the deputy obtained Pond's admission of methamphetamine use during a questioning incident to a valid traffic stop. He also found the deputy did not threaten Pond or physically restrict his movement during the questioning and that the questioning was not coercive or police dominated. We agree with these findings of fact. Under the law applicable to United States district courts, such questioning is not a custodial interrogation for purposes of *Miranda* and rights warnings are not required. *Pennsylvania v. Bruder*, 488 U.S. 9, 109 S.Ct. 205, 102 L.Ed.2d 172 (1988); *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Therefore, with no requirement for rights warning applicable, Pond's statements were not involuntary or inadmissible under Mil.R.Evid. 305(a) and 304(a).

### III. Suppression of the Methamphetamine Residue.

■ We also agree with the military judge's ruling admitting into evidence the plastic bag with methamphetamine residue found on Pond the night of his arrest. The deputy properly obtained this evidence in a search incident to arrest.

The deputy saw Pond commit a driving violation, measured the dilation of Pond's pupils, observed his agitated condition and unusually rapid performance of the field sobriety tests, heard Pond admit using methamphetamine, and observed his white-coated tongue. The military judge found these facts gave the deputy probable cause to arrest Pond for driving under the influence of drugs or alcohol. We agree.

It is not clear from the evidence whether the deputy searched Pond before or after arresting him. However, the deputy's testimony clearly showed he decided to arrest Pond before he began to search him.

■ A lawfully arrested person may be searched incident to the arrest. *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *United States v. Cordero*, 11 M.J. 210 (C.M.A.1981); Mil. R.Evid. 314(g)(1). If there were probable cause to arrest at the time of the search and the arrest came in close proximity to the search, the search remains lawful regardless whether it occurred before or after the arrest. *Rawlings v. Kentucky*, 448 U.S. 98, 111, 100 S.Ct. 2556, 2564, 65 L.Ed.2d 633 (1980); *United States v. Acosta*, 11 M.J. 307, 311 (C.M.A.1981). Evidence obtained in a lawful search incident to arrest is admissible in a court-martial. Mil.R.Evid. 314(a).

### IV. Suppression of the Urinalysis.

We do not agree with the military judge's ruling denying suppression of the results of Pond's urinalysis. The issue raised in appellant's case appears to be one of first impression. We could find no case contesting the prosecution of a person for use of an illegal drug based on a urinalysis or blood test taken by a police officer under an implied consent law. At trial the government relied upon *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) and California Vehicle Code § 23157. The military judge relied upon the California Vehicle Code and a California Court case [5] to find the urinalysis results admissible.

In its brief to us, the government argues three alternative rationale for admitting appellant's urinalysis. First, the government contends the deputy properly took appellant's urine sample with the "consent" of appellant under California's implied consent statute. Second, the government would find the urinalysis admissible under *Schmerber* by finding exigent circumstances required the taking of appellant's urine sample incident to the arrest. Third, the government argues the good faith exception of *Illinois v. Krull*, 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) ap-

---

5. The case relied upon, *People v. Brannon*, 32 Cal.App.3d 971, 108 Cal.Rptr. 620 (5th Dist. 1973), holds that a failure to inform the arrested driver that he has a choice of the type of test does not, by itself, render the test results inadmissible under California law.

plies because of the California deputy's "objectively reasonable reliance" on the California implied consent statute.

We agree the three theories advanced by the government exhaust the possibilities under the facts of appellant's case. However, we address each theory and find no merit in any of them. First, we find that the Fourth Amendment applies to the taking of urine samples by police officers and the preference for a warrant is only abated in cases of consent or exigent circumstances. Second, we examine the rationale for implied consent statutes and the consequences of failing to follow procedures contained in such statutes. Third, we find the police officer failed to comply with the applicable implied consent statute and no actual or valid implied consent existed for the taking of appellant's urine sample. Fourth, absent consent, we find *Schmerber* requires exigent circumstances to seize a urine sample, and we find no exigent circumstances justified the seizure of appellant's urine sample without a warrant. Finally, we review the "good faith" doctrine and find it inapplicable to appellant's case.

### A. Fourth Amendment Application to Taking of Urine Samples.

When an state or local official performs a search or seizure, a court-martial determines the admissibility of the fruits of that search under the Constitution of the United States and the principles of law applied in the trial of criminal cases in the United States district courts. Mil.R.Evid. 311(c)(2); *see also* Article 36(a), UCMJ, 10 U.S.C. § 836(a).

Urine test results showing traces of an illegal drug in urine are admissible in federal courts as proof of the use of the illegal drug. *See, e.g., United States v. Rodriguez-Pando,* 841 F.2d 1014 (10th Cir.1988). However, a person engaging in the act of urination has a reasonable expectation of privacy for that act and the urine excreted. *See Lovvorn v. Chattanooga,* 915 F.2d 1065, 1067 (6th Cir.1990); *National Treasury Employees Union v. Von Raab,* 816 F.2d 170, 175–76 (5th Cir.1987) ("There are few activities in our society

more personal or private than the passing of urine."); *Capua v. Plainfield,* 643 F.Supp. 1507, 1513 (D.N.J.1986) ("Urine . . . is normally discharged and disposed of under circumstances that merit protection from arbitrary interference."). Because of this reasonable expectation of privacy, requiring a person to provide a urine sample involves a search or seizure under the Fourth Amendment. *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 678–79, 109 S.Ct. 1384, 1397–98, 103 L.Ed.2d 685 (1989); *Skinner v. Railway Labor Executives Association,* 489 U.S. 602, 616–18, 109 S.Ct. 1402, 1412–13, 103 L.Ed.2d 639 (1989); *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984); *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).

When a person must produce a urine or blood sample for law enforcement purposes, the presumption is that the procedures of the Warrant Clause of the Fourth Amendment will apply. *Railway Labor Executives,* 489 U.S. at 619, 109 S.Ct. at 1414; *National Treasury Employees,* 489 U.S. at 679, 109 S.Ct. at 1397; *Griffin v. Wisconsin,* 483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987); *Schmerber,* 384 U.S. at 770, 86 S.Ct. at 1835; *Graves v. Beto,* 301 F.Supp. 264 (E.D.Tex. 1969), *aff'd,* 424 F.2d 524 (5th Cir.), *cert. denied,* 400 U.S. 960, 91 S.Ct. 353, 27 L.Ed.2d 269 (1970).

The leading case dealing with taking a body fluid sample for evidence in a criminal prosecution is the case the government relied upon at trial, *Schmerber v. California. Schmerber* found that taking a blood sample involuntarily from a driver suspected of driving under the influence of intoxicating liquor did not violate the Fourth Amendment. The *Schmerber* Court based its decision on the exigency created by the evanescent nature of blood alcohol and the danger that important evidence would disappear without an immediate search. 384 U.S. at 770, 86 S.Ct. at 1835. The Court recognized that police officers have the authority to search a lawfully arrested person

for evidence or concealed weapons, but it rejected justifying the seizure of a blood sample on the mere fact of an arrest:

> While early cases suggest that there is an unrestricted right ... to search the person of the accused when legally arrested to discover and seize the fruits of evidences of crime, the mere fact of a lawful arrest does not end our inquiry. The suggestion of these cases apparently rests on two factors first, there may be more immediate danger of concealed weapons or destruction of evidence under the direct control of the accused; second, once a search of the arrested person for weapons is permitted, it would be both impractical and unnecessary to enforcement of the Fourth Amendment's purpose to attempt to confine the search to those objects alone. What ever the validity of these considerations in general, they have little applicability with respect to searches involving intrusions beyond the body's surface. The interest in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained.

*Schmerber*, 384 U.S. at 769–70, 86 S.Ct. at 1835 (citations omitted).

After stating the above, the Court noted the preference for searches authorized by a warrant issued by a neutral and detached magistrate is even stronger where the search involves the taking of bodily fluids. 384 U.S. at 770, 86 S.Ct. at 1835. However, the Court found that the circumstances of *Schmerber* were such that the arresting officer faced an emergency situation where a delay to get a warrant would have risked destruction of the evidence. 384 U.S. at 770, 86 S.Ct. at 1835. They noted that, because the percentage of alcohol in the blood begins to diminish shortly after drinking stops, an emergency or exigent circumstances rationale required the taking of Schmerber's blood without waiting for a warrant. 384 U.S. at 770–71, 86 S.Ct. at 1835–36. They also found the method used to take the blood, a physician in a hospital, to be reasonable. 384 U.S. at 771, 86 S.Ct. at 1836.

After stating its holding, the Court emphasized its narrowness:

> It bears repeating, however, that we reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States' minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions.

*Schmerber*, 384 U.S. at 772, 86 S.Ct. at 1836.

Another Supreme Court decision closely associated with *Schmerber* is *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973). In *Cupp*, the Court upheld a search involving limited intrusion into a person's body when probable cause existed and imminent destruction of evidence was likely. Cupp voluntarily went to the police station for questioning about the strangulation death of his wife. At the station, a police officer noticed a dark spot on one of Cupp's fingers and thought it might be dried blood. The police officer knew that evidence of strangulation is often found under the assailant's fingernails. After Cupp refused to consent to fingernail scrapings, the police officer took fingernail scrapings over Cupp's protests without a warrant or a prior arrest. Evidence gained from the scraping led to Cupp's conviction of murder. Using the same rationale as *Schmerber*, the *Cupp* Court found the existence of probable cause, a very limited intrusion, and an exigency created by ready destructibility of the evidence made the taking valid under the Fourth Amendment. *Cupp*, 412 U.S. at 296, 93 S.Ct. at 2004.

Our understanding of the above holdings is that the Fourth Amendment applies to the taking of body fluids. Further, when police officers seek to obtain evidence through a nonconsensual taking of body fluids or an intrusion into a person's body, a warrant is required except when exigent circumstances are present.

### B. Basis of Implied Consent.

Following the *Schmerber* decision, many state legislatures enacted implied consent statutes to provide police officers a means of obtaining consensual urine, blood, and breath samples. Such statutes were approved as a legitimate means for police authorities to take samples from individuals suspected of operating motor vehicles on public roads and highways while under the influence of alcohol or drugs. *See, e.g., South Dakota v. Neville,* 459 U.S. 553, 559, 103 S.Ct. 916, 920, 74 L.Ed.2d 748 (1983); *United States v. Harvey,* 701 F.2d 800 (9th Cir.), *reh'g denied,* 711 F.2d 144 (1983); *Hernandez v. Department of Motor Vehicles,* 30 Cal.3d 70, 177 Cal.Rptr. 566, 634 P.2d 917 (1981); *People v. Superior Court of Kern County,* 6 Cal.3d 757, 761, 100 Cal.Rptr. 281, 283, 493 P.2d 1145, 1147 (1972); *Carleton v. Superior Court,* 170 Cal.App.3d 1182, 216 Cal.Rptr. 890 (4th Dist.1985).

The presence of an implied consent statute does not relieve police officials from the need to comply with the constraints of the Fourth Amendment and *Schmerber. See e.g., Neville,* 459 U.S. at 559, 103 S.Ct. at 920; *Hernandez,* 177 Cal.Rptr. at 569, 634 P.2d at 920; *People v. Trotman,* 214 Cal.App.3d 430, 438 n. 6, 262 Cal.Rptr. 640, 645 n. 6 (2d Dist.1989); *People v. Bloom,* 142 Cal.App.3d 310, 316, 190 Cal.Rptr. 857, 861 (2d Dist.1983); *People v. Ryan,* 116 Cal.App.3d 168, 182, 171 Cal.Rptr. 854, 861 (1st Dist.1981); *People v. Fite,* 267 Cal. App.2d 685, 690–91, 73 Cal.Rptr. 666 (1968). State and federal decisions interpreting implied consent statutes note that they provide a method to obtain voluntary urine, blood, or breath samples without resorting to force or coercion. *See e.g., United States v. Snyder,* 852 F.2d 471, 473 (9th Cir.1988); *Harvey,* 701 F.2d at 803; *People v. Milhollin,* 751 P.2d 43 (Colo.1988); *Hernandez,* 177 Cal.Rptr. at 570, 634 P.2d at 921; *Ryan,* 171 Cal.Rptr. at 861; *Commonwealth v. Trefry,* 249 Pa.Super. 117, 128, 375 A.2d 786, 792 (1977); *Layland v. State,* 535 P.2d 1043 (Alaska 1975), *rev'd on other grounds, Anchorage v. Geber,* 592 P.2d 1187 (1979); *People v. Brannon,* 32 Cal.App.3d 971, 974, 108 Cal.Rptr. 620, 622 (5th Dist.1973); *Fite,* 73 Cal.Rptr. at 669.

If police authorities fail to follow the procedures of implied consent statutes or are unable to obtain the tested sample voluntarily, some state and federal courts interpreting the federal implied consent statute find test results on the seized samples inadmissible. *State v. Loscomb,* 291 Md. 424, 435 A.2d 764 (1981); *Anchorage v. Geber,* 592 P.2d 1187 (Alaska 1979); *McDonald v. State,* 364 So.2d 1241 (Fla.App. D2 1978); *People v. Wheatley,* 5 Ill.App.3d 827, 284 N.E.2d 353 (1972). Most states, including California, do not refuse to admit urine, blood, or breath test results solely because of failures to follow the statute or to obtain a voluntary sample. *Trotman,* 262 Cal.Rptr. at 645 n. 6; *State v. Baker,* 502 A.2d 489 (Me.1985); *Ryan,* 171 Cal. Rptr. at 861; *State v. Dewey,* 272 N.W.2d 355 (Minn.1978); *Trefry,* 375 A.2d at 792; *Brannon,* 108 Cal.Rptr. at 623; *see also,* California Vehicle Code § 23157.5(d). In those states, admissibility following a failure to comply with the implied consent statute is determined on the basis of *Schmerber. Trotman,* 262 Cal.Rptr. at 645 n. 6; *In re Garinger,* 233 Cal.Rptr. 853, 856, 188 Cal.App.3d 1149 (4th Dist. 1987); *Bloom,* 190 Cal.Rptr. at 862; *State v. Garner,* 227 Kan. 566, 608 P.2d 1321 (1980); *State v. Aguirre,* 295 N.W.2d 79 (Minn.1980); *Brannon,* 108 Cal.Rptr. at 623; *Fite,* 73 Cal.Rptr. at 670.

### C. Application of Implied Consent to Appellant's Case.

■ We do not agree with the government's contention that the California implied consent statute provides an alternative "consent" ground for the admissibility of the results of appellant's urine test. We find the deputy's failure to follow the statute resulted in a nonconsensual taking of appellant's urine sample.

Appellant's arrest occurred in San Bernardino County, California. Since he was not on a federal enclave at the time of the arrest or the taking of the urine sample, the federal implied consent statute did not apply. *See* 18 U.S.C. § 3118(a) (1990).

Therefore, if appellant had been prosecuted in a California court, California implied consent law and the Fourth Amendment would have applied to the taking of appellant's urine sample.

We disagree with the government's claim that if appellant were prosecuted in a federal district court, the federal court would apply California law to determine whether to admit the results of appellant's urine test. Federal district courts do not use state statutory or case law to determine the admissibility of test results on urine, blood, or breath samples taken under a state implied consent statute. *United States v. Roberts*, 845 F.2d 226, 228 (9th Cir.1988), *cert. denied*, 488 U.S. 845, 109 S.Ct. 121, 102 L.Ed.2d 95 (1988); *United States v. Wilmer*, 799 F.2d 495, 500 (9th Cir.1986), *cert. denied*, 481 U.S. 1004, 107 S.Ct. 1626, 95 L.Ed.2d 200 (1987). Admissibility of evidence is governed by federal standards and the United States Constitution. *Wolfle v. United States*, 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617 (1934); *United States v. McMillan*, 820 F.2d 251, 255 (8th Cir.), *cert. denied*, 484 U.S. 898, 108 S.Ct. 234, 98 L.Ed.2d 193 (1987); *United States v. Collins*, 552 F.2d 243, 247 (8th Cir.), *cert. denied*, 434 U.S. 870, 98 S.Ct. 214, 54 L.Ed.2d 149 (1977); *United States v. Sacco*, 491 F.2d 995, 1003 (9th Cir.1974).

■ However, in appellant's case, the result will be the same regardless whether we apply California law or the law applied by federal district courts.[6] In taking appellant's urine sample, the California deputy did not follow the terms of the California implied consent statute. The deputy gave appellant none of the advice the statute required concerning the consequences of refusing to consent, appellant's choices as to types of tests, and the opportunity to choose a method of testing that would provide for a retained sample. *See* California Vehicle Code §§ 23157, 23157.5, Stats.1986.

The deputy testified that appellant had no choice but to give the sample and that he had not bothered to explain appellant's choices or the reason for the request. He merely directed appellant to give the sample. Under similar circumstances, California courts have found samples not to have been taken voluntarily. *See e.g., People v. Deltoro*, 214 Cal.App.3d 1417, 1420, 263 Cal.Rptr. 305, 307 (1st Dist.1989) (police officer told Deltoro he had violated law and would have to take a blood test); *Trotman*, 262 Cal.Rptr. at 641 (police officer told nurse to take blood sample without asking consent of Trotman); *Brannon*, 108 Cal. Rptr. at 622–23 (police officer placed Brannon in front of breathalyzer and told him to blow into mouthpiece). After reviewing the testimony of both the deputy and appellant, we find that appellant did not voluntarily give his urine sample.

When voluntariness is not present or the implied consent statute is not followed, California courts apply the same Fourth Amendment analysis of *Schmerber* and *Cupp* to the taking of the sample as they would absent the statute. *See e.g., Deltoro*, 263 Cal.Rptr. at 307–08; *Trotman*, 262 Cal.Rptr. at 644, 645 n. 6; *Garinger*, 233 Cal.Rptr. at 856; *Bloom*, 190 Cal.Rptr. at 862; *Ryan*, 171 Cal.Rptr. at 861; *Brannon*, 108 Cal.Rptr. at 623; *Fite*, 73 Cal. Rptr. at 670. California courts are required by the California constitution to apply federal constitutional law to determine the validity of the taking of a blood or urine sample for criminal prosecution purposes. California Constitution Article I, Section 28(d); *Deltoro*, 263 Cal.Rptr. at 308; *Trotman*, 262 Cal.Rptr. at 644; *In re Lance W.*, 37 Cal.3d 873, 884, 210 Cal.Rptr. 631, 694 P.2d 744 (1985). Under the law applied by federal district courts, the result is the same. *Snyder*, 852 F.2d at 473.

Recent California decisions have noted that *Schmerber* was "fundamentally an ex-

---

**6.** At one time the "silver platter" doctrine would have brought about a different result in this type of case. Under that doctrine, evidence of a crime illegally seized by state police could be turned over to federal authorities and used in a federal prosecution as long as federal agents did not participate in the illegal search. *See Lustig*

*v. United States*, 338 U.S. 74, 79, 69 S.Ct. 1372, 1374, 93 L.Ed. 1819 (1946); *Weeks v. United States*, 232 U.S. 383, 398, 34 S.Ct. 341, 346, 58 L.Ed. 652 (1914). This doctrine was overturned in *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

igency case" that "relied almost exclusively on the exigency created by the evanescent nature of blood alcohol." *Deltoro,* 263 Cal. Rptr. at 308; *Trotman,* 262 Cal.Rptr. at 645. Under these decisions, admissibility relied upon *Schmerber* and *Cupp* and depended upon the exigency or need created by the evanescent nature of the evidence. *Deltoro,* 263 Cal.Rptr. at 308; *Trotman,* 262 Cal.Rptr. at 644.

We conclude that neither a federal district court nor a California court would find the results of appellant's urine test admissible under California's implied consent statute. Rather, both courts would apply the Fourth Amendment and *Schmerber* to determine the test results' admissibility. *Snyder,* 852 F.2d at 473; *Harvey,* 701 F.2d at 803; *Holland v. Parker,* 354 F.Supp. 196, 199 (D.S.D.1973); *Deltoro,* 263 Cal. Rptr. at 307–08; *Trotman,* 262 Cal.Rptr. at 644, 645 n. 6; *Garinger,* 233 Cal.Rptr. at 856; *Bloom,* 190 Cal.Rptr. at 862; *Ryan,* 171 Cal.Rptr. at 861; *Brannon,* 108 Cal. Rptr. at 623; *Fite,* 73 Cal.Rptr. at 670.

**D. Application of Fourth Amendment and *Schmerber* to Appellant's Case.**

Under the Fourth Amendment, a urine sample intended for criminal prosecution has to be obtained with the consent of the person, ordered by a warrant issued under proper Fourth Amendment protections, or taken under the guidance of *Schmerber* and *Cupp.* *National Treasury Employees,* 489 U.S. at 665, 678, 109 S.Ct. at 1390, 1397; *Schmerber,* 384 U.S. at 770, 86 S.Ct. at 1835; *United States v. McClain,* 31 M.J. 130, 133 (C.M.A.1990); *see also, Deltoro,* 263 Cal.Rptr. at 308; *State v. Williams,* 4 Kan.App.2d 651, 610 P.2d 111 (1980); *Ryan,* 171 Cal.Rptr. at 861; *Layland,* 535 P.2d at 1045; *Trefry,* 375 A.2d at 793.

Since appellant did not consent to the taking of his urine sample and the deputy

neither sought nor obtained a warrant to seize the sample from appellant, this case is governed by *Schmerber* and *Cupp.*

Applying the holdings of *Schmerber* and *Cupp* to Pond's case, we find no difficulty with the deputy's probable cause or "clear indication" that a urine sample would provide evidence of drug use. He carefully observed, tested, and questioned Pond before arresting him and did a fine job of establishing the probable cause for his arrest and to take a urine or blood sample. The problem with Pond's case is the lack of "emergency" or exigent circumstances to require a nonconsensual taking of a urine sample without a warrant.

 The deputy knew Pond was under the influence of methamphetamine. Pond passed the field sobriety tests and exhibited behavior inconsistent with alcohol intoxication. This inconsistent behavior caused the deputy to continue to question and observe Pond until the deputy's observations and Pond's admissions supported his conclusion of methamphetamine use. When the deputy took Pond to the police station, he never considered giving Pond a breath test, although California law would have required giving Pond that choice if alcohol intoxication were suspected. California Vehicle Code § 23157(a)(2)(A). The deputy testified he told Pond to give a urine sample because that was the only available test that would detect the methamphetamine use.[7] After Pond gave the urine sample, the deputy took him to jail where he was booked and confined.

Unlike the evanescent nature of blood alcohol levels, the presence of methamphetamine in urine can be detected for an extended period. We take judicial notice that urine tests indicate methamphetamine use some 24 to 48 hours after consumption of the drug.[8] Therefore, emergency or exi-

---

7. California Vehicle Code § 23157(a)(2)(C) provided that the arresting police officer could require the arrested person to submit to a blood or urine test in addition to a breath test if the officer has reasonable cause to believe the person is under the influence of a drug and the officer has a clear indication one of these tests would provide evidence of that influence.

8. R. Hawks and C. Chiang, *Urine Testing for Drugs of Abuse,* National Institute on Drug Abuse Research Monograph No. 73, 1986, page 96, Government Printing Office (1987); C.W. Gorodetsky, *Detection of Drugs of Abuse in Biological Fluids,* Handbook Exp. Para. 45: 319–409 (1977); E.R. Rutter, *Automated Method for Screening Urine for Amphetamine and Some Re-*

gent circumstances were not present to require Pond to give a nonconsensual urine sample without a warrant ordering seizure of the sample.[9] Pond remained in police custody after his arrest and the deputy could have obtained a warrant without any significant risk of losing evidence of methamphetamine use. Thus, there was no exigency to excuse obtaining a warrant and appellant's test results should have been excluded.

### E. Good Faith Exception.

■ We do not agree with the government's assertion that the good faith exception of *Illinois v. Krull*, 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) and *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) should apply to appellant's case. A review of the doctrine shows why.

*Leon* first stated the good faith exception. In *Leon*, the Supreme Court held the Fourth Amendment exclusionary rule inapplicable to evidence obtained by a police officer acting in objectively reasonable reliance on a defective search warrant issued by a neutral magistrate. The Court stressed that the prime purpose of the judicially created exclusionary rule was to deter future police misconduct and its application should be restricted to situations which advance this remedial purpose. *Leon*, 468 U.S. at 906, 104 S.Ct. at 3411.

In *Krull*, an Illinois state statute required persons who dealt in motor vehicles or automotive parts to get a license and maintain detailed records of motor vehicles and parts. The statute also required licensees to permit state authorities to inspect the required records and the dealers' premises to determine the accuracy of the records. A detective inspected Krull's records and premises and found three stolen vehicles. The Illinois Supreme Court later found the inspection provision of the statute unconstitutional, and Krull challenged his conviction. The United States Supreme Court found the evidence gained by the inspection admissible because of the detective's good faith reliance on the statute. Restating the prime purpose of the Fourth Amendment exclusionary rule, the Court found no remedial purpose in applying the rule to exclude evidence a police officer obtained in "objectively reasonable reliance" on a statute later found to be invalid. *Krull*, 480 U.S. at 348–49, 107 S.Ct. at 1166–67.

Turning to appellant's case, the inapplicability of *Leon* and *Krull* immediately becomes apparent. The deputy taking appellant's urine sample did not rely upon a warrant or a statute later determined to be defective or invalid. The deputy sought no warrant, and he failed to comply with any of the provisions of the statute the government claims he relied upon. He never told appellant the reason for requesting the urine sample or its intended use and did not give appellant any of the required advice concerning the choices available to him and the consequences of refusing to give the sample.[10] We cannot find the deputy had any "objectively reasonable reliance" upon a statute he admitted he did not follow.

lated *Primary Amines*, Clinical Chemistry 18: 616–620 (1972).

9. The government contends that exigent circumstances may have been present. They speculate that at some point in time Pond's "blood-methamphetamine" level would drop below the level considered impaired for driving-while-impaired purposes and that the deputy could have believed that he was faced with exigent circumstances. However, the government introduced no evidence of a required "blood-methamphetamine" level at trial, and we are not going to find the presence of exigent circumstances based on such speculation. The deputy's testimony contained no indication of any concern about any emergency or exigency involved in taking Pond's urine sample. In fact, the evidence of record is to the contrary. The deputy knew appellant had used methamphetamine just before his arrest. There were no intervening factors like those present in *Schmerber*—an accident to investigate or injuries to treat. Appellant was taken into custody early in the evening, remained in custody, and there is no evidence that a magistrate was not readily available.

10. We also note the deputy failed to comply with the statute's requirements for reporting the facts upon which he formed the belief appellant was driving under the influence of a drug and the clear indication that a urine test would reveal evidence of being under such influence. *See* California Vehicle Code § 23157(a)(2)(C).

Further, applying the rationale of *Krull* and *Leon*, we can readily identify a remedial purpose to be served by applying the Fourth Amendment exclusionary rule to appellant's case. The deputy taking appellant's urine sample showed a complete disregard for California's implied consent law and appellant's Fourth Amendment reasonable expectations of privacy. If a state police officer deliberately decides not to follow a state statute designed to insure the protection of a citizen's constitutional rights, he should follow the decisions of his state's supreme court and the United States Supreme Court concerning those rights. Failing to do either, he provides a good example of the type of police conduct sought to be deterred by application of the Fourth Amendment exclusionary rule. The "good faith" doctrine does not apply to this case.

### F. Conclusion.

The results of Pond's nonconsensual urinalysis are not admissible because the urine sample tested was taken without consent and without a warrant in a seizure that violated the Fourth Amendment. The military judge should have suppressed the urinalysis.

### V. Effect of the Conditional Plea.

■ We note that Pond's court-martial occurred before our decision in *United States v. Phillips*, 32 M.J. 955 (A.F.C.M.R. 1991); *see also United States v. Birbeck*, 35 M.J. 519, 522–24 (A.F.C.M.R.1992) (Pratt, S.J., concurring); *United States v. McLaren*, 34 M.J. 926, 927 n. 1 (A.F.C.M.R. 1992). In *Phillips*, we expressed concern about the difficulty of determining whether the issues preserved by conditional guilty pleas are case or offense dispositive. 32 M.J. at 957. Although the parties in this case reduced their conditional plea to writing, this document did not address the possibility of an appellate court reversing only one of the military judge's suppression rulings. The parties' agreement provides that appellant will be allowed to withdraw his plea of guilty if he prevails on appeal.[11] This appellant has partially prevailed upon appeal. Does this mean he may withdraw all of his pleas?

Our review of the evidence shows that suppression of the urinalysis results affects only two of Pond's three guilty pleas. The most convincing single item of proof of Pond's methamphetamine use and operation of a motorcycle while impaired by the drug is the urinalysis. We are not ignoring that the deputy's observations and Pond's admission also provide considerable proof of these offenses. However, we find it impossible to determine what the findings would have been on these offenses absent the positive urinalysis.

Pond's guilty plea to possession of methamphetamine is not affected by our finding that the urinalysis results must be suppressed. The proof of this offense rests independently on the product of a lawful search incident to arrest.

We set aside appellant's sentence and convictions to use of methamphetamine and operation of a motorcycle while impaired by methamphetamine. A rehearing is authorized on the convictions set aside and the sentence. At that rehearing, appellant may withdraw his pleas of guilty to use of methamphetamine and operation of a motorcycle while impaired by methamphetamine.

Judges JAMES and JOHNSON, concur.

---

**11.** R.C.M. 910(a)(2) provides no additional help with our problem. It contains the same words as the agreement of the parties: "If the accused prevails on further review or appeal, the accused shall be allowed to withdraw the plea of guilty."